UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GREGORY HANNUM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:04-cv-1445-DFH-TAB |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

ENTRY ON JUDICIAL REVIEW

Plaintiff Gregory Hannum seeks judicial review of a final decision by the Commissioner of Social Security that, as of April 29, 2002, he was no longer entitled to disability insurance benefits under the Social Security Act. Mr. Hannum had earlier been found to be disabled due to a seizure disorder that ultimately required a temporal lobectomy. An Administrative Law Judge found that he had improved to the point that he was no longer disabled. The Appeals Council denied review of the ALJ's decision, leaving that determination as the final decision of the Commissioner.

Mr. Hannum, proceeding *pro se*, contends that the ALJ erred in failing to account adequately for his impairments and in failing to weigh properly the

opinion of his treating physician. Mr. Hannum also submits evidence not in the record and seeks a remand pursuant to sentence six of 42 U.S.C. § 405(g). As explained below, the case must be remanded under sentence four of § 405(g) for further evaluation of Mr. Hannum's psychological condition. One psychological evaluation indicated that Mr. Hannum was unemployable, though there were questions about the validity of the result. The ALJ's decision to discount the test results was not supported by substantial evidence, and the ALJ did not adequately explain his decision on that critical issue. Because the court remands under sentence four of § 405(g), it does not reach the issue of a remand under sentence six.

*Background*

Gregory Hannum was born May 7, 1952. He was 51 years old when the ALJ denied his application for Social Security benefits in March 2004. Mr. Hannum completed high school, attended college for two years, and received training in auto mechanics. R. 11.

1.   *Medical History*

Mr. Hannum has a lifelong history of epileptic seizures. In 1992 he underwent a temporal lobectomy and had additional surgery on his brain in 1993. Mr. Hannum testified at his hearing that he has not had a seizure since 1993. R.

457, 463. Mr. Hannum claimed that his brain surgery and his medications have, however, produced long-term negative psychological effects.

The medical evidence regarding Mr. Hannum's alleged psychological condition comes primarily from three sources. Mr. Hannum's long-term primary care physician is Paul Rice, M.D., a neurologist. Dr. Rice referred Mr. Hannum to Robert Thomas, Ph.D., and Jon Holdread, M.D., for psychological evaluation. On June 10, 2002, Dr. Rice wrote that Mr. Hannum, since his brain surgery in 1992, "has attempted to return to work on several occasions but has not been able to meet the tasks of working a 40-hour workweek. He is currently undergoing neuropsychological testing to see if we can figure out the reason for that." R. 247.

On June 27, 2002, Dr. Thomas, a clinical neuropsychologist, evaluated Mr. Hannum for behavioral problems. R. 258-61. Mr. Hannum reported daily outbursts of anger. R. 258. Dr. Thomas reported that Mr. Hannum's general intelligence, as measured by the Wechsler Adult Intelligence Scale-Revised, was at the norm for his age. Subtest scatter was minimal. The Wechsler Memory Scale-Revised showed that Mr. Hannum had great difficulty learning the Visual Paired Associates portion of the test, scoring only 5 out of 18 during the initial trials. Immediate recall for the Wechsler stories was at the 29th percentile, with delayed recall of the material at the 30th percentile. Mr. Hannum scored 14/14

-3-

for information and orientation, 6/6 for mental control, and 8/10 for figural memory.  R. 259.

Dr. Thomas also administered the Minnesota Multiphasic Personality Inventory-2 test (MMPI-2).  R. 259.[1]  Dr. Thomas reported on the results of the test:

> Evidence of delusions and thought disorder may be present.  He may be exhibiting a high degree of distress and personality deterioration.
>
> A severe psychological disorder is reflected in this profile.  The client appears to be experiencing a florid psychotic process that includes personality decompensation, social withdrawal, disordered affect and erratic, possibly assaultive behavior.  He appears to be quite confused, withdrawn, and preoccupied with occult or abstract ideas.  He may feel that others are against him because of his beliefs.  He might spend a great deal of time in fantasy, and might suffer from hallucinations, blunted or inappropriate affect and hostile, irritable behavior.  He appears confused and disoriented, and he may behave in unpredictable, aggressive ways.  The MMPI-2 clinical profile reflects chronic maladjustment although he may presently be experiencing an intensification of problems.  Personality decompensation, disorganization, and thought disorder are likely to persist.

R. 259-60.  Dr. Thomas also reported "average cognitive abilities with no clear evidence of organic cerebral dysfunction in the cognitive testing."  R. 260.

Dr. Thomas offered this caution about the test results, however:

---

[1]The MMPI-2 is an assessment of personality characteristics and overall level of emotional adjustment.

[Mr. Hannum's] responses to this questionnaire should be interpreted with caution.  He is presenting an unusual number of psychological symptoms.  This response set could result from confusion, stress or need to seek a great deal of attention for his problems.  Alternatively, they could represent a true psychotic condition.

The MMPI suggested a frankly psychotic, possibly paranoid schizophrenic person.  His actual behavior during testing, however, showed no evidence of delusions or hallucinations.  He did appear quite anxious and at times defensive.  It is possibly of some interest that he is currently being evaluated for Social Security.

R. 259-61.  Dr. Thomas summarized his findings again in a follow-up report in

July 2002 and again noted uncertainty about the validity of the test results:

The MMPI-2 profile should be interpreted with caution.  There is some possibility that the clinical report is an exaggerated picture of the client's present situation and problems.  He is presenting an unusual number of psychological symptoms.

His test-taking attitudes should be evaluated for the possibility that he has produced an invalid profile.  He may be showing a lack of cooperation with the testing, or he may be malingering by attempting to present a false claim of mental illness.  There was, for instance, very little evidence of such a level of confusion in the actual time spent taking a neuropsychological test.  While the MMPI suggested evidence of delusions and thought disorder, no such evidence was present during the actual confrontation.

It may be of considerable importance that no hallucinations or delusions were revealed during the three hours of neuropsychological evaluation.  This suggests the possibility that there may be some conscious exaggeration in his answers to the MMPI.

R. 254-57.

On July 1, 2002, Dr. Rice wrote that Mr. Hannum's neuropsychological testing, including an MMPI, had been completed. R. 246. Dr. Rice stated that the cognitive testing showed an average IQ, that part of the test for memory showed Mr. Hannum was easily distracted, and that the MMPI test suggested severe psychological disorder. *Id.* Dr. Rice concluded, "I think we have proven the point that Greg Hannum, at this point, is not capable of being gainfully employed." *Id.*

Dr. Holdread, a psychiatrist, evaluated Mr. Hannum on July 18, 2002. R. 243. Mrs. Hannum reported to Dr. Holdread that after her husband's brain surgery in 1992, he had increasingly become quick to anger and rigid and compulsive in his thinking and actions. R. 243. Dr. Holdread concluded that there were no other signs of obsessive compulsive disorder, that Mr. Hannum did not report feeling depressed and gave no indication of suicidal or delusional thinking, that he showed no disordered thought processes, that there were no indications of psychotic symptoms, that he tended to be cautious and leery of people but not to the point of being overtly paranoid, and that "certainly" there were no indications of delusion. R. 245. Dr. Holdread's provisional psychological diagnosis of Mr. Hannum included personality change secondary to brain trauma, and possible obsessive compulsive personality features. *Id.* Dr. Holdread also noted that Mr. Hannum was starting to take BuSpar for his anger. On August 21 and September 18, 2002, Mr. Hannum returned to Dr. Holdread for a medication

-6-

Case 1:04-cv-01445-DFH-TAB   Document 22   Filed 07/27/05   Page 7 of 24 PageID #: 87


check. R. 151-52. Dr. Holdread reported on September 18th that overall there had been some mild improvement in Mr. Hannum's anger response. R. 152.

On December 11, 2002, Dr. Rice completed a form setting forth his medical opinion regarding Mr. Hannum's ability to do work-related activities. R. 39-42. Dr. Rice opined that, in the context of unskilled work, Mr. Hannum had poor or no ability to maintain attention for two consecutive hours, to maintain regular attendance and be punctual, to work in coordination with others, to complete a normal workday without interruptions from psychological symptoms, to accept instructions and respond appropriately to criticism, to respond appropriately to changes in a routine work setting, and to deal with normal stress. R. 39-40. Where the form asked Dr. Rice to identify the medical and clinical findings that supported his assessment, Dr. Rice referenced and quoted from Dr. Thomas' report of the MMPI-2 results. Dr. Rice did not mention Dr. Thomas' concerns about the validity of the test. R. 40-42.

In 1999, Mr. Hannum injured his right shoulder in an auto accident. R. 469. As a result, he had his shoulder joint replaced. R. 264. In March 2002, a consulting examiner reported that Mr. Hannum's right shoulder range of motion was fairly well preserved and that his grip strength was slightly below that seen in the left arm. R. 268. Although the shoulder injury imposes some limits on Mr.


-7-

Hannum's ability to work, it does not render him disabled.  The key issue here concerns his psychological condition.

2.    *Procedural History*

Mr. Hannum applied for disability insurance benefits on May 16, 1975.  R. 448-51.  The Social Security Administration determined on May 18, 1976 that Mr. Hannum had been disabled since September 30, 1974 due to a seizure disorder that equaled the requirements of Listing 11.02.  R. 85-94.  Mr. Hannum's case was reviewed in 1977 and again in 1983.  Both times his disability benefits were continued.  Mr. Hannum's case was again reviewed on April 29, 2002, after which he was notified that because his seizure disorder had improved, he was no longer considered disabled.    R. 445-47.    A disability hearing officer affirmed the termination of disability benefits.  R 430-42.  At Mr. Hannum's request, ALJ Peter Americanos heard his case on October 30, 2003.  Gail Ditmore testified as a vocational expert and James Brooks, Ph.D., a clinical psychologist, testified as a medical expert.  Kathleen Hannum testified as a witness.  Mr. Hannum was represented by an attorney at the hearing.

The ALJ issued a decision on March 19, 2004, finding that Mr. Hannum's disability resulting from a seizure disorder had ceased effective April 29, 2002, due to medical improvement.  R. 11-12.  The ALJ also found that Mr. Hannum's current impairments did not render him disabled.  R. 12.  The Appeals Council

-8-

denied Mr. Hannum's request for review of the ALJ's decision. R. 3-5. Thus, the ALJ's decision is treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

### *The Statutory Framework for Determining Disability*

After the Social Security Administration determines that a claimant is disabled, it must evaluate the claimant's impairments "from time to time to determine if [the claimant is] still eligible for disability cash benefits." 20 C.F.R. § 404.1589. In evaluating a claimant's continued eligibility for benefits, the agency must consider whether "there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." 20 C.F.R. § 404.1594. In addition, the agency must establish "that [the claimant is] currently able to engage in substantial gainful activity before [the agency] can find that [the claimant is] no longer disabled." *Id.* When the SSA terminates a claimant's benefits, it must examine "all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition" and must determine whether "the individual is now able to engage in substantial gainful activity. . . ." 42 U.S.C. § 423(f). The Seventh Circuit has upheld the agency's interpretation of the terms "now" and "current" to refer to the date the agency found that the claimant's disability had ceased. *Johnson v. Apfel*, 191 F.3d 770, 775-76 (7th Cir.

-9-

1999).

To be eligible for the disability insurance benefits he seeks, Mr. Hannum must establish that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d). This showing would be presumed if Mr. Hannum's impairments met or medically equaled any impairment listed in Part 404, Subpart P, Appendix 1 of the implementing regulations, and if the duration requirement were met. 20 C.F.R. § 404.1520(d). Otherwise, Mr. Hannum can establish disability only if his impairments were of such severity that he was unable to perform not only the work he had previously done, but also any other kind of substantial work existing in the national economy. 20 C.F.R. § 404.1520(f) and (g).

This eligibility standard is stringent. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). The Act provides important assistance for some of the most disadvantaged members of American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that a claimant has an impairment severe enough to prevent him from performing virtually any

-10-

kind of work.  Under the statutory standard, these benefits are available only as a matter of nearly last resort.

Social Security regulations set forth an eight-step analysis applicable to cases in which a disability ends.  20 C.F.R. § 404.1594(f).  The procedure incorporates the familiar five-step analysis common to initial disability cases (see § 404.1520(a)(4)), but also addresses medical improvement.  The eight steps are:

(1)   Is the claimant engaged in substantial gainful activity?  If so, his or her disability has ended.

(2)   If not, does the claimant have an impairment or combination of impairments that meet(s) or equal(s) the severity of a listed impairment?  If so, the disability will be found to continue.

(3)   If not, has there been a medical improvement?  If so, go to step (4).  If not, go to step (5).

(4)   Is the medical improvement related to the claimant's ability to do work; *i.e.*, has there been an increase in the claimant's residual functional capacity (RFC)?  If not, go to step (5).  If so, go to step (6).

(5)   If at step (3) there has been no medical improvement, or if at step (4) medical improvement is not related to ability to do work, do any exceptions apply?  If one of the improvements from the first group of medical improvements applies, then we look to step (6).  If an exception from the second group applies, then the disability has ended.

(6)   Are the claimant's current impairments severe in combination?  If not, the disability has ended.

(7)   If so, can the claimant (based on his or her residual functional capacity) perform his or her past relevant work?  If so, the disability ends.

(8)     If not, can the claimant do other work given his or her residual
        functional capacity, age, education, and work experience?  If
        so, the disability has ended.

Here, the relevant comparison date for determining whether and when Mr.
Hannum's disability ended is February 23, 1983, the date of the most recent
favorable decision that Mr. Hannum was disabled.  See 20 C.F.R. § 404.1594(b)(7).


Applying this analysis, the ALJ found that Mr. Hannum was not engaged
in substantial gainful activity (step 1); that his condition no longer met or equaled
any listed impairments (step 2); that his condition had improved since the relevant
comparison date (step 3); and that this improvement was related to his ability to
do work (step 4).  R. 16.  At step 6, the ALJ found that Mr. Hannum's seizure
disorder, which had been the basis of his disability, no longer warranted the
establishment of any significant work-related functional limitations.  The ALJ also
found that Mr. Hannum suffered from additional impairments that might produce
work-related limitations:  a personality disorder and a degree of depression, and
an artificial right shoulder.[2]  The ALJ found at step 7 that Mr. Hannum had no
past relevant work.  At step 8, the ALJ found that Mr. Hannum had gained the
ability to perform light work with additional limitations and that he could perform
a significant number of jobs in the national economy.  R. 16-17.

_____

[2]The ALJ found no evidence to support Mr. Hannum's alleged work-related
limitations due to hearing, memory, and balance problems.  R. 12.

-12-

## Standard of Review

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689. The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

*Discussion*

Mr. Hannum, who has proceeded in this appeal without legal counsel, asks the court to overturn the ALJ's decision that he is not qualified to receive disability benefits. In the alternative, Mr. Hannum asks the court to remand the case, with additional evidence he has submitted to the court, for a new hearing with a different ALJ.[3]

I.    *Improvement of Seizure Disorder*

Mr. Hannum's seizure disorder was the basis for the original determination of disability in 1976. The ALJ found that the seizure disorder had medically improved since February 23, 1983, and that seizures did not prevent Mr. Hannum from working after April 29, 2002. Mr. Hannum testified that he had not had a seizure since 1993. Mr. Hannum argues that, although his epileptic seizures have been controlled by surgery and medication, he continues to have all other symptoms of epilepsy. The court can find no evidence in the record indicating that Mr. Hannum still suffers from symptoms of the original seizure disorder itself.

---

[3]Mr. Hannum also argues that, due to his age, lack of work skills, lack of education, and length of time already on disability, he is qualified to continued disability benefits. Generally, a person of advanced age with no relevant work experience and a limited education will be considered disabled provided his impairment is severe. Social Security Ruling 82-63. This rule does not apply to Mr. Hannum. He is not a person of advanced age (age 55 or older, § 404.1563(e)) and does not have a limited education or less (generally 7th grade through the 11th grade of formal education, § 404.1564(b)(3)).

-14-

The ALJ's conclusion that Mr. Hannum's seizure disorder no longer imposes significant work-related limitations is supported by substantial evidence.

II.    *Additional Psychological Impairments*

Mr. Hannum argues that he has a psychological disorder stemming from his 1992-93 brain surgery. The ALJ assessed the evidence in the record pertaining to memory problems, personality disorder, and depression. The ALJ, citing the results of the Wechsler Memory Scale-Revised administered by Dr. Thomas in June 2002, noted that testing did not show that Mr. Hannum had any significant problem with memory. The ALJ emphasized that Mr. Hannum's test scores were perfect for information and orientation and for mental control, and were above average for figural memory. R. 12. The ALJ also stated that Mr. Hannum's ability at the hearing to testify about the details of his activities, and of books he had read and information he had learned, showed that his memory remained intact. R. 12.

The ALJ next addressed Mr. Hannum's behavioral problems. The ALJ concluded that "in consideration of the evidence regarding the claimant's mental condition, I find that while he might have some degree of depression and/or a personality disorder, he remains capable of performing at least some types of work." R. 14. The ALJ reached that conclusion by considering the medical reports and opinions of Drs. Thomas, Rice, and Holdread; the assessments of

-15-

consulting examiners, state agency physicians, and the disability hearing officer; and Mr. Hannum's report of his daily activities. R. 14-15.

The ALJ discussed the results of the MMPI-2 administered by Dr. Thomas, which reflected that Mr. Hannum was experiencing a florid psychotic process that included personality decompensation, social withdrawal, disordered affect, and erratic, possibly assaultive behavior, as well as other symptoms. The ALJ noted Dr. Thomas' warning that the MMPI-2 should be interpreted with caution. The ALJ stated, "Dr. Thomas explained that the claimant presented an unusual number of psychological symptoms, which could be due to confusion, stress, a need to seek a great deal of attention for his problems, or, less likely, due to a true psychotic condition." R. 13. The ALJ also noted Dr. Thomas' statement that Mr. Hannum's actual behavior during testing showed no evidence of delusions, hallucinations, or thought disorder.

The ALJ then discounted the medical opinion of Dr. Rice that Mr. Hannum was not capable of working. Dr. Rice presented no medical evidence other than the MMPI-2 administered by Dr. Thomas to support his opinion. The ALJ explained that Dr. Rice, who was a neurologist, was not qualified to give an opinion on Mr. Hannum's mental condition, and that his opinion was on an issue reserved for the Commissioner. The ALJ also stated that Dr. Rice "appears to have accepted as fact statements which Dr. Thomas presented only as

unsubstantiated possibilities that would require further evaluation to confirm,"

and that he ignored Dr. Thomas' caveat to the MMPI-2 results.  R. 13.[4]

After discounting Dr. Rice's opinion and the results of the MMPI-2

administered by Dr. Thomas, the ALJ found that the remaining evidence did not

show that Mr. Hannum had a psychological condition that would prevent him

from working full time.  Dr. Holdread, after examining Mr. Hannum, reported that

there was no evidence of a thought process disorder, psychotic symptoms,

paranoia, or delusions.  R. 13-14, 244-45.  Consulting and state agency examiners

found no medically determinable impairments or functional limits due to a

psychological condition.  R. 342-78.  The ALJ found that Mr. Hannum's daily

activities indicated that he was capable of performing a range of activities that

_____

[4]Mr. Hannum argues that the ALJ improperly dismissed the opinion of Dr. Rice, his long-term primary care physician, in favor of the opinions of medical experts who examined him only briefly or not at all.  The ALJ did not necessarily err by discounting Dr. Rice's opinion, at least to the extent the opinion was based on the uncertain MMPI-2 results rather than on independent medical evidence. Generally, the Commissioner gives more weight to opinions from treating sources than to those from other sources because treating physicians are most likely to be able to provide a detailed longitudinal picture of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2).  Dr. Rice may be uniquely situated to provide a long-term perspective on Mr. Hannum's behavior.  However, an ALJ may reject or discount a physician opinion if it is unsupported by sufficient medical evidence or is inconsistent with other substantial medical evidence in the record, if the opinion is outside the physician's area of specialization, or if the opinion is on an issue reserved to the Commissioner.  § 404.1527(d); SSR 96-2.  Because this case must be remanded, however, it may be helpful to Mr. Hannum and to the ALJ to secure a more detailed explanation from Dr. Rice of the reasons for his opinion.

-17-

require physical and mental abilities.  R. 15.  The ALJ also noted that Mr. Hannum had performed part-time work with no apparent difficulties.  R. 15.

The ALJ erred, however, by overstating doubts about the validity of the MMPI-2 test results and by discounting those results when Dr. Thomas was not prepared to do so.  At the hearing, Dr. Brooks testified about the potential importance of the MMPI-2 to the disability determination:

ALJ:        Do you think that he is capable of doing work of average difficulty, high difficulty, complex work or simple and repetitive tasks?

Dr. Brooks: Again, his IQ scores were within the average range, which in and of itself, would usually indicate a person could do anything, other than extremely complex [things] or things that might involve mathematics or higher-level decision-making, whatever.  So I would assume that based on those scores from the neuropsych testing that he would be able to do sort of hands-on, repetitive kinds of things.

ALJ:        OK.

Dr. Brooks: What's really the fly in the ointment here is that MMPI.

ALJ:        I understand.

-18-

R. 482.[5]  On cross-examination, Dr. Brooks explained the "fly in the ointment."
He testified that if the MMPI-2 results were valid, Mr. Hannum would be
unemployable.  R. 483.  The court assumes that Dr. Brooks had evaluated all the
evidence, including Dr. Holdread's report which conflicted with the MMPI-2
results, when he indicated that the validity of the MMPI-2 was a decisive issue.[6]

       The critical point here is that Dr. Thomas did *not* say that the MMPI-2
results were not valid.  Rather, he said only that the validity of the results was
uncertain.  Dr. Thomas recommended that Mr. Hannum's "test-taking attitudes
should be evaluated for the possibility that he has produced an invalid profile."
R. 255.  He also recommended that "the possibility that [Mr. Hannum] could act
out in an aggressive manner on his delusional ideas should be further evaluated."
R. 260.  And contrary to the ALJ's statement in his opinion, R. 13, Dr. Thomas did
not state that a true psychotic condition was "less likely" than other explanations
for the test results.  Rather, Dr. Thomas stated:

---

[5]The ALJ stated that he was giving the benefit of the doubt to Mr. Hannum
by limiting him to no more than superficial interaction with the public, co-
workers, and supervisors and to simple and repetitive tasks.  R. 14.  According to
the ALJ, these limitations were inconsistent with the opinion of Dr. Brooks "who
testified that [Mr. Hannum] is capable of doing complex work."  R. 14.  This
characterization of Dr. Brooks' opinion ignores Dr. Brooks' critical next statement
that "the fly in the ointment" was the MMPI-2.

[6]The vocational expert testified that if Mr. Hannum was unable to maintain
regular attendance, to be punctual, and to deal with normal work stress without
breaking into a violent rage, he would not be employable.  R. 497.

-19-

> [Mr. Hannum's] responses to this questionnaire should be interpreted
> with caution. He is presenting an unusual number of psychological
> symptoms. This response set could result from confusion, stress or
> need to seek a great deal of attention for his problems. Alternatively,
> they could represent a true psychotic condition.

R. 259. Overall, Dr. Thomas' report does not indicate that the MMPI-2 results
could simply be discounted or rejected, as the ALJ did. Rather, Dr. Thomas'
statements indicate that the MMPI-2 results may have represented a true
psychosis or they may have represented an invalid profile. Further investigation
was required to determine which characterization was more accurate.

The MMPI-2 yielded striking but questionable results. The medical expert's
testimony indicated that the issue of whether the MMPI-2 results were valid was
in fact decisive for the disability determination. Dr. Thomas indicated in his
report that the validity of the profile should be evaluated further. If the MMPI-2
results were as flawed as the ALJ suggested in his decision, then the ALJ had an
obligation to obtain more information on the MMPI-2 results, to request a follow-
up MMPI-2, to obtain expert opinion that no MMPI-2 would be reliable applied to
Mr. Hannum, or at least to discuss whether or not the MMPI-2 was necessary to
fully evaluate Mr. Hannum's psychological condition. In fact, the ALJ suggested
in his decision that further evaluation was needed to confirm or negate the validity
of the MMPI-2: "Dr. Rice appears to have accepted as fact statements which Dr.
Thomas presented only as unsubstantiated possibilities *that would require further
evaluation to confirm.*" R. 13 (emphasis added).

A remand in this case is required because the ALJ did not support with substantial evidence his decision to discount the MMPI-2 results. Instead, he misstated the views of Dr. Thomas in a way that exaggerated his doubts about the results. A remand in this case is also consistent with the general principle that the ALJ has a duty to develop a "full and fair record," and that the remedy for failure to do so is a remand to gather the additional evidence. See, *e.g.*, *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999); *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993); *Smith v. Secretary of Health, Ed. and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978). The ALJ's duty to develop the record is especially critical, of course, where the applicant is not represented by counsel, but the ALJ still has some responsibility for developing the record even where the applicant had counsel, as Mr. Hannum did before the ALJ. See *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988) (remanding for psychological evaluation of alcoholism; ALJ failed to develop record adequately even where claimant was represented by counsel). The Social Security regulations promise: "If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have. . . . [I]f after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will . . . request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our

-21-

expense, or ask you or others for more information."  20 C.F.R. § 404.1527(c)(2)-
(3).

The Seventh Circuit has stated that the court should defer to the ALJ's
"reasoned judgment" on how much evidence to collect in assessing a claim of
disability.  See *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).  The Seventh
Circuit pointed out that "one may always obtain another medical examination,
seek the views of one more consultant, wait six months to see whether the
claimant's condition changes, and so on."  22 F.3d at 692, quoting *Kendrick v.
Shalala*, 998 F.2d at 456-57.  As the Seventh Circuit explained in *Kendrick*,
insistence on a truly "complete" record would be a formula for paralysis that
would conflict with the design for relatively informal hearings in which the ALJ
has a partially inquisitorial role.  *Id.* at 457.  If the ALJ is able to weigh the record
evidence and determine whether the claimant is disabled based on that evidence,
then she is not required to obtain additional evidence.  *Smith v. Apfel*, 231 F.3d
at 443 (Ripple, J. dissenting); *Henderson v. Apfel*, 179 F.3d at 513.

In this case, if the ALJ had made a reasoned judgment that he had enough
information about Mr. Hannum's psychological condition, the court would defer
to that judgment.  But the ALJ did not address in his decision the critical and
obvious question raised by Dr. Thomas in his report and by the medical expert at
the hearing:  were the MMPI-2 results valid?  The ALJ simply discounted the

-22-

MMPI-2 results rather than seek to answer this key question on a reasoned basis. He did not make a "reasoned judgment" that no further information was needed.

Mr. Hannum argues that the court should remand the case pursuant to sentence six of 42 U.S.C. § 405(g) to consider new evidence.[7]  Because the court remands under sentence four of § 405(g), it does not reach the issue of a sentence-six remand.  The new psychological evaluation by Dr. Cecil should be available to the ALJ on remand.  A more detailed report from Dr. Rice, explaining more fully the medical basis of his opinion, would also be helpful on remand.  The Social Security Administration will make the decision whether or not to assign Mr. Hannum's case to a new ALJ.

### Conclusion

For the reasons set forth above, the court REMANDS this case to the Commissioner for a new hearing to allow further evaluation of the results of the Minnesota Multiphasic Personality Inventory-2 tests and additional proceedings consistent with this decision.  Final judgment will be entered immediately.

---

[7]Mr. Hannum submits five new pieces of evidence:  (1) a letter from Lora Ayers, a counselor at the state vocational rehabilitation agency; (2) a letter from Leonard Pogue, an employment consultant; (3) a statement from Mrs. Hannum; (4) a report on the results of a new MMPI-2 test administered on December 8, 2004 by Michael Cecil, Psy.D., a clinical neuropsychologist at Columbus Regional Hospital, the same hospital where Dr. Thomas administered the first MMPI-2; and (5) a December 15, 2004 statement by Dr. Rice that he agrees with Dr. Cecil's evaluation.

So ordered.

Date: July 27, 2005

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

GREGORY NEIL HANNUM, *pro se*
8853 North Miami Ridge Road
Columbus, IN 47201

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov